No. 25-10840

# In the United States Court of Appeals for the Eleventh Circuit

VENTURE COMMODITIES, INC.; *Plaintiff-Appellant*

v.

THE CITY OF CANTON, GEORGIA, BILLY PEPPERS, AND DAVID HATABIAN;

*Defendant-Appellees*.

On Appeal from the United States District Court for the Northern District of Georgia, Atlanta Division

BRIEF OF APPELLANT

Xavier T. Romero
State Bar No. 303588
FLINT, CONNOLLY & WALKER, LLP
131 East Main Street
Canton, Georgia 30114

25-10840
Venture Commodities, Inc. v. The City of Canton, *et al.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURES

Appellant, Venture Commodities, Inc. hereby certifies that the following is a complete list of the trial judges and all attorneys, persons, associations of persons, firms, partnerships, or corporation that have an interest in the outcome of this appeal:

1. Bain, Michael P., attorney for Plaintiff-Appellant;

2. Balch Law Group, law firm for Defendants-Appellees;

3. Balch, Chris, attorney for Defendants-Appellees.

4. Boulee, J.P., District Court Judge for the Northern District of Georgia;

5. Braaksma, Christopher, owner of Venture Commodities, Incorporated;

6. The City of Canton, Georgia, Defendant-Appellee;

7. Flint, Connolly & Walker, LLP, law firm for Plaintiff-Appellant;

8. Flint, Douglas H., attorney for Plaintiff-Appellant;

9. Hatabian, David, individually and in his official capacity as engineer for the City of Canton, Defendant-Appellee;

10. Peppers, Billy, individually and in his official capacity as the city manager for the City of Canton, Defendant-Appellee;

11. Romero, Xavier T., attorney for Plaintiff-Appellant;

i

12. Venture Commodities, Inc., a private Georgia corporation and Plaintiff-Appellant.

Appellant Venture Commodities Inc., through its undersigned counsel and pursuant to 11th Cir. R. 26.1-3(b), certifies that no publicly traded company or corporation has an interest in the outcome of this appeal.

Respectfully submitted this 20th day of June, 2025.

FLINT, CONNOLLY & WALKER, LLP

XAVIER T. ROMERO
Georgia Bar No.: 303588

### STATEMENT REGARDING ORAL ARGUMENT

Appellant, Venture Commodities, Inc. requests oral argument as it believes a discussion regarding what constitutes an exaction taking, and its subsequent pleading requirements, would be beneficial to the Court.

## TABLE OF CONTENTS

Certificate of Interested Persons ................................................................. i

Statement Regarding Oral Argument ....................................................... iii

Table of Contents ..................................................................................... iv

Table of Citations ..................................................................................... vi

Statement of Jurisdiction .......................................................................... 1

Statement of Issues Presented .................................................................. 2

Statement of the Case ............................................................................... 3

Procedural History .................................................................................... 4

Statement of Facts ..................................................................................... 5

Standard of Review ................................................................................. 15

Summary of the Argument ...................................................................... 16

Argument and Citations of Authority .................................................... 20

    I. B THE DISTRICT COURT'S ANALYSIS MISCONSTRUED THE ACTION AS A LEGISTLATIVE TAKING, NOT AN EXACTION WHICH VIOLATES THE FIFTH AMENDMENT .......................................... 20

    II. UNDER GEORGIA LAW, PLAINTIFF'S VESTED RIGHT IN THE DISCHARGE PERMIT IS A CONSTITUTIONALLY PROTECTED PROPERTY RIGHT ................................................................... 26

        A. The Application of Montana State Law and Legislative Takings Do Not Apply ................................................................................. 26

        B. Under Georgia Law, Plaintiff has a Vested Right in the Permit ................................................................................................ 30

        C. The Court Misapplied the Attributes of a Protected Property Interest ................................................................................................ 33

Conclusion .............................................................................................. 37

Certificate of Compliance ...................................................................... 38

Certificate of Service .............................................................................. 39

TABLE OF CITATIONS

Supreme Court of the United States

    *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972) ..........................................30

    *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .........................................15

    *Dolan v. City of Tigard*, 512 U.S. 374 (1994)............................20, 21, 23-25

    *Nollan v. Cal. Coastal Com*, 483 U.S. 825 (1987) ........................................24

    *Sheetz v. Cnty. of El Dorado*, 601 U.S. 267 (2024) ...................17, 20, 22-24

Eleventh Circuit Court of Appeals

    *Checker Cab Operators, Inc. v. Miami-Dade Cnty.*, 899 F.3d 908, 917 (11th Cir. 2018) .............................................................................................................30

    *Givens v. Ala. Dep't of Corrs.*, 381 F.3d 1064, 1066 (11th Cir. 2004) ... 29, 30

    *Kessler v. City of Key West*, 2022 U.S. App. LEXIS 5302, *7 (11th Cir. 2022) ........................................................................................................................15

    *Marine One, Inc. v. Manatee County*, 898 F.2d 1490 (11th Cir. 1990).........35

    *Middleton v. IBM*, 787 Fed. Appx. 619, 622 (11th Cir. 2019).......................15

Supreme Court of Georgia

    *Abramyan v. State of Ga.*, 301 Ga. 308 (2017).................................................32

    *Goldrush II. v. City of Marietta*, 267 Ga. 683, 695 (1997)............................31

    *Hayes v. Howell*, 251 Ga. 580, 584 (1983)....................................................30

City Ordinances

    CANTON CITY ORDINANCES, § 114-317(a) ........................................................32

    CANTON CITY ORDINANCES, § 114-315 .............................................................32

Supreme Court of Montana

    *Kafka v. Mont. Dep't of Fish, Wildlife & Parks*, 201 P.3d, 8 (Mont. 2008)..

    ................................................................................................................... 27, 28

## STATEMENT OF JURISDICTION

The United States District Court for the Northern District of Georgia had jurisdiction to hear the present matter under 28 U.S.C. § 1331 regarding plaintiff's claims brought under 42 U.S.C. § 1983.

This appeal rises from the district court's order dismissing plaintiff's federal law claims under 42 U.S.C. § 1983 on February 10, 2025. Plaintiff timely field its Notice of Appeal on March 11, 2025. As this order is a final decision of the district courts of the United States which disposed of all claims, the Court of Appeals for the Eleventh Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUE PRESENTED

1. Whether the district court performed the correct analysis to determine that Venture Commodities sufficiently pleaded an exaction taking as a violation of the Takings Clause of the Fifth Amendment to the United States Constitution.

## STATEMENT OF THE CASE

This appeal arises from the dismissal of Appellant Venture Commodities, Inc.'s claim under 42 U.S. Code § 1983 as a result of the City of Canton's violation of the Fifth Amendment Takings Clause. The claim arose when the City revoked Venture Commodities' water discharge permit without cause and then promised to reinstate that permit only under conditions which bear no relation to the undetermined cause for revocation in the first place. Venture Commodities has alleged this constitutes an exaction taking which violates the Takings Clause of the Fifth Amended of the United States Constitution.

Procedural History

Appellant, Venture Commodities, Inc. ("VCI") filed its initial complaint on March 8, 2024.[1] After the City responded with a motion to dismiss on April 24, 2024,[2] VCI filed its First Amended Complaint ("FAC") on May 8, 2024.[3] The City again responded with another motion to dismiss on May 20, 2024.[4] Ultimately, the district court granted the City's motion to dismiss.

In its Order on February 10, 2025, the district court ruled that "Plaintiff's interest in the Permit is not property for purposes of the Takings Clause."[5] The court reasoned, "Plaintiff has conflated its due process property interest in the Permit with the property interests necessary to establish a claim under the Takings Clause."[6] It concluded Appellant failed to "appreciate the critical distinction between what might be considered property for purposes of due process, and what types of interests are considered compensable under the Fifth Amendment."[7]

Appellant VCI timely filed its Notice of Appeal to this Court on March 11, 2025. The parties engaged in mandatory mediation with the Kinnard Mediation

---

[1] Doc.1.
[2] Doc. 8.
[3] Doc. 9.
[4] Doc. 12.
[5] Doc. 18 at 9.
[6] Doc. 18 at 11.
[7] Doc. 18 at 11 citing *Kafka*.

Center. When mediation efforts failed, the clerk extended Appellant's time to file this brief until June 20, 2025.

Statement of Facts

The following allegations are alleged in the First Amended Complaint:

Venture Commodities is an industrial company that treats animal fats, vegetable oils, derivatives, and greases (commonly known as "FOG") for use by other commercial ventures such as renewable fuels and commercial feed rations for agricultural livestock.[8] This process involves discharging water used to clean equipment, boiler condensate, and rainwater containing small amounts of fully emulsified oils into the city sewer system for further treatment at the City's wastewater treatment plant.[9] After the discharge water is pre-treated by Venture Commodities, it travels through an exclusive branch line until it reaches an intersection at the main sewer conduit. It is important to note, this intersection is separately joined by another branch coming from nearby La Luna Bakery Panaderia.

These operations were authorized by an Industrial Wastewater Discharge Permit, permit number 008 ("IPP Permit"), issued August 7, 2003 and renewed without interruption until November 2023.[10] The most recent renewal, issued on November 14, 2018, made the IPP Permit valid until midnight on November 30,

---

[8] Doc. 9, ¶ 12.
[9] *Id.*, ¶ 14.
[10] *Id.*, ¶ 15, Exhibit A.

2023.[11] No issues arose between the City and VCI regarding the IPP Permit until March 2023.[12]

Then, during a heavy rainfall on Thursday, March 9, 2023, VCI discovered its exclusive branch to the main conduit on its campus was obstructed, causing discharge water to back up without indication as to why.[13] Finding the sewer still clogged on the following Monday, March 13th, VCI alerted the City to the issue so it investigate and remedy the situation.[14] Instead, the City responded by revoking the IPP Permit without any prior examination of the sewer obstruction.[15]

City Manager, defendant Billy Peppers, sent an email on March 15th to the Canton Mayor announcing his intention to "issue a shutdown order for the business and schedule a hearing to either modify or revoke their discharge permit."[16] In that email, Peppers fully admits that "[t]here is an ordinance that places this under my control for review."[17] Peppers's email indicates he intended to revoke the IPP Permit and shut down VCI's business altogether regardless of any fault for the sewer blockage could be attributed to VCI.

---

[11] *Id.*, ¶ 16, Exhibits A and B.
[12] *Id.*, ¶ 24.
[13] *Id.*, ¶ 27.
[14] *Id.*, ¶ 28.
[15] *Id.*, ¶ 34, Exhibit E.
[16] *Id.*, ¶ 29, Exhibit D.
[17] *Id.*, ¶ 29, Exhibit D.

The Canton ordinance Peppers referred to in this email is Section 114-317(a) of the City's municipal code which states:

> When city manager has reason to believe that any one of the conditions enumerated in subsection (b) below exists, he shall give written notice thereof to the permittee. .... At the hearing, the permittee shall have an opportunity to refute the allegations set forth in the proposed permit revocation notice. If after the hearing the city manager finds that any one of the conditions hereinafter enumerated in subsection (b), below, exists, he shall have the right to suspend, revoke or deny the permit.[18]

That subsection (b) of the ordinance provides an exhaustive list of thirteen specific grounds upon which the city can revoke or suspend an existing permit or deny an application for renewal.[19]

Following through on his predetermined plan to shut down VCI, Peppers sent a letter on March 15th, ordering VCI to "cease and desist all discharges into the City of Canton's sanitary sewer system," revoking all purposeful rights of the IPP Permit.[20] In that letter, Peppers claimed a March 14th inspection "revealed non-compliance with the requirements of the IPP Permit."[21] VCI alleged that no such inspection took place partially based on the City's subsequent refusal to provide any basis or explanation for the suspension or revocation of the permit.[22]

---

[18] *Id.*, ¶¶ 107.
[19] *Id.*, ¶¶ 108.
[20] *Id.*, ¶ 35.
[21] *Id.*, ¶ 36.
[22] *Id.*, ¶ 37.

In this vague and threatening letter, Peppers further stated, "Our team has observed numerous concerns with your operations–or current lack thereof–as well as with the buildings and grounds of the facility. You have much to work on and I have much to consider."[23] Peppers concluded, "simply put, at this time your operations are not following the processes, protocols, and requirements of the IPP."[24] To date, the City has never specified how VCI was noncompliant or even which enumerated provision of Section 114-317(b) served as a basis for Peppers's decision.

Not only did the City never provide any basis for revoking the permit, it refused to. When VCI's President, Christopher Braaksma, subsequently asked for clarification regarding the alleged noncompliance, defendant David Hatabian, the City's utility engineer responded, "We are not going to tell you what needs to be done to fix and repair all your deficiencies."[25]

As a further intimidation tactic, the City also issued two personal citations against Braaksma.[26] The citations reference Section 114-527 of the City's municipal code for "prohibition of illicit discharge" and another under Section 114-530 for "notification of accidental discharges and spills."[27] Just as with the IPP Permit, the City refused to disclose any details as to why either citation was issued. In fact, both

---

[23] *Id.*, ¶¶ 37-38.
[24] *Id.*, ¶¶ 39.
[25] *Id.*, ¶¶ 51-52, Exhibit H.
[26] *Id.*, ¶ 43.
[27] *Id.*, ¶¶ 43-44.

summonses, attached to the FAC as Exhibit F, include a looming, empty space in the box labeled, "Narrative."

Five days _after_ the IPP Permit was revoked and the citations were issued against Braaksma, the City sent an email to Stacey Wix at Georgia EPD asking for assistance investigating the sewer blockage because "the State has more resources available."[28] To guarantee the success of his plan to shut down VCI's business, Peppers sent an email to several city employees and Wix, suggesting a "pre meeting (if possible) at City Hall to go over all of our notes ahead of time, _just to assure everyone is on the same page_."[29]

To the City's dismay, when Will Jacobs from Georgia EPD did visit the site, he did not find VCI at fault for the sewer obstruction. Rather, he was reportedly "pleased with the assessment and response progress" and "analytical reports received to date indicate no organics contamination of surface waters."[30]

In the following months, VCI met with the City several times, but it still refused to hold the required hearing under Section 114-317(a), disclose what basis under Section 114-317(b) the permit had been revoked, or reinstate the IPP Permit. This refusal to conduct a hearing or provide a basis for the revocation is not offered under Procedural Due Process grounds, but only as an example of the City's

---

[28] _Id._, ¶¶ 53-54.
[29] _Id._, ¶¶ 54-55 (emphasis added).
[30] _Id._, ¶¶ 56-58.

concerted, malicious efforts to attack VCI beyond the limits of their official capacity. As further evidence, in a March 30, 2023 meeting, Peppers made several derogatory statements including that VCI was "not the kind of business the City wants."[31]

Throughout the course of these events, VCI came to suspect the City's deliberate attempt to suffocate the business was part of a scheme to gentrify that area through the phased development of a neighborhood it calls "Sunnyside."[32] Publicly available documents indicate that VCI's Goss Street facility lies directly within the planned boundary for Sunnyside improvements.[33] The Sunnyside development calls for walking trails and new bridges to which an industrial processing plant of animal fats would be a stark contrast and monstrously expensive for the City to remove.

In an August 3, 2023 meeting Hatabian laid out a list of nine unreasonable and constantly-evolving conditions to reinstate the permit.[34] In particular, the City required VCI to find the still-undetermined sewer impediment and remove it from the City's sewer.[35] Once accomplished, VCI was required to clean the City's sewer and provide video evidence that the condition was satisfied.[36]

---

[31] *Id.*, ¶ 60.
[32] *Id.*, ¶ 62.
[33] *Id.*, ¶ 62, Exhibit L—N.
[34] *Id.*, ¶ 72.
[35] *Id.*, ¶ 73.
[36] *Id.*

Relying on the City's assurances, VCI employed Environmental Management Services, Inc. ("EMS") to find, unclog, and clean the relevant sewer pipes in the vicinity.[37] When Hatabian followed up with VCI in an August 29, 2023 email, asking "Has sewer been pumped, cleaned and camered [sic] yet?",[38] VCI was encouraged that its compliance would ensure the permit's reinstatement.

During the City-ordered cleaning of its own sewers, EMS discovered the location and composition of the sewer obstruction.[39] Engineers Mike Sams and Brian Rindt determined the blockage was composed of oil and flour consistent with the waste output of nearby La Luna Bakery,[40] and not the emulsified oils that VCI regularly discharged under its IPP Permit rights.[41] When the City learned EMS's findings were contrary to its earlier intention to find fault in VCI, it ordered VCI to stop all further remedial work.[42]

During the course of this remedial work, the suspended or revoked IPP Permit's term neared its end on November 30, 2023. Despite the unclear state of the existing permit, VCI submitted an application for renewal on October 31, 2023.[43] Peppers initially responded the next day, November 1, 2023 that the City would not

---

[37] Doc. 9, ¶ 74.
[38] *Id.*, ¶ 75.
[39] *Id.*, ¶ 76.
[40] *Id.*, ¶ 76, Exhibits C, O.
[41] *Id.*, ¶¶ 77-78.
[42] *Id.*, ¶ 81.
[43] *Id.*, ¶ 84.

renew the existing permit because it was not submitted sixty days prior to its expiration.[44] Despite this position, Peppers also told VCI that it should confer with Hatabian, who could "speak to the permit application required for a new permit."[45] Peppers's suggestion was merely a ruse. One month prior, on October 4th, the City's attorney advised Peppers that it may finally "be time to tell them" the IPP Permit would not be reinstated, "and to explain why not."[46] The Permit's fate had been predetermined.

On December 18, 2023, Peppers sent a one-sentence letter to VCI, citing Section 114-312 of Canton's ordinances, and denied VCI's application for a second discharge permit without any further explanation.[47] However, that code section is not a basis for an absolute denial, it merely delays a permit term's start: "Existing users shall apply for a discharge permit within 60 days of notification by the city that a discharge permit is required."[48]

Grounds for an actual denial of a new permit or denial to renew an existing discharge permit rests within the same ambit of the City's provision for suspending or revoking such a permit, Section 114-317(a). Both require the city manager to state

---

[44] Doc. 9, ¶ 85.
[45] *Id.*, ¶ 86.
[46] *Id.*, ¶ 114, Exhibit K.
[47] *Id.*, ¶ 87, Exhibit J.
[48] *Id.*, ¶¶ 88-89.

a basis for denial under Section 114-317(b): "Any of the following is reason for permit <u>suspension</u>, <u>revocation</u> or <u>denial</u>…."

Peppers again intentionally ignored this code, despite his acknowledgment of the provision in his email to the Canton Mayor. Canton ordinances provide no discretion to avoid stating and showing a basis to exclude VCI from its ongoing Permit rights. The City never held a hearing regarding either the existing IPP Permit, nor on the application for a new or renewed permit.

After the events of March 2023, the City also never held a hearing on to explain the basis for these criminal citations it issued to Braaksma. For ten months, the City held the threat of criminal prosecution over VCI's president for charges that were never substantiated. But once Braaksma retained counsel who submitted an entry of appearance on December 15, 2023, the City began finally addressed the citations by retreating.[49] On January 29, 2024, the City's attorney informed VCI's counsel that "the pending citations against Christopher Braaksma have been nolle prossed."[50] The City never provided an explanation as to why the citations were issued or why they were dismissed.

At the same time, Peppers knowingly refused to provide VCI with any indication as to which of the thirteen enumerated grounds under Section 114-317(b)

---

[49] Doc. 9, ¶ 46, Exhibit G.
[50] *Id.*, Exhibit G.

was the basis for suspending or revoking the permit. Without a proper basis to revoke the permit, Peppers intentionally avoided a hearing on the matter as required under Section 114-317(a).

Worse, Peppers, along with his co-conspirator, Hatabian, abused their capacity as City officials to further this scheme to squeeze VCI out of the City with discriminatory treatment like these unreasonable conditions. Those conditions continuously changed each time they were satisfied. For instance, VCI did comply with the City's demand to clean the discharge line. But when it was reported that VCI had not been the cause all along, the City immediately turned a deaf ear to any further discussion of the Permit's reinstatement.

The City hoped to then replace VCI with developments for its ideal neighborhood under the belief that, without the Permit, VCI would leave of its own accord, without just compensation for its losses. After months of VCI's damages, lost business, and costly remediation attempts in order to have its discharge permit reinstated, it filed this suit alleging an exaction taking under Fifth Amendment's Takings Clause.

14

## STANDARD OF REVIEW

A court reviews "*de novo* the grant of a motion to dismiss for failure to state a claim to relief, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff."[51] "To survive a motion to dismiss, the complaint must 'contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'[52] That means the complaint's non-conclusory factual allegations, accepted as true, 'must be enough to raise a right to relief above the speculative level.'"[53] "Review of a motion to dismiss is ordinarily 'limited to the four corners of the complaint.'"[54] When "a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder."[55]

---

[51] *Kessler v. City of Key West*, 2022 U.S. App. LEXIS 5302, *7 (11th Cir. 2022) (citations omitted).

[52] *Id.*

[53] *Id.*

[54] *Middleton v. IBM*, 787 Fed. Appx. 619, 622 (11th Cir. 2019) (citation omitted).

[55] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007).

## SUMMARY OF THE ARGUMENT

The City of Canton, through the abuse of its administrative offices, performed an exaction taking upon Venture Commodities, Inc. which violated the Fifth Amendment of the United States Constitution. The City has experienced a void of intellectual capital with regard to its water treatment operations in recent years. As a result, its foundations have deteriorated. At the same time, the City has made efforts to gentrify the neighborhood located, named Sunnyside, where VCI is located.

During a heavy rainfall, VCI self-reported an issue to the City regarding its water disposal infrastructure. The sewer that VCI's drainage feeds into experienced an unknown blockage, causing the rain and discharge water to back up and seep out of the ground on VCI's facility on Goss Street in Canton. Rather than investigate the cause and remedy the issue, the City retaliated. In the City manager's email, he documented his intent to conspire with local officials to "shut down" VCI. Before any investigation was even attempted, the City manager asked for a meeting with relevant personnel involved to "assure everyone is on the same page." The punitive conditions that followed sought to kill two birds with one stone.

To oust the industrial business from the Sunnyside neighborhood and improve the City's infrastructure at the same time, the City held VCI's water discharge permit ransom until VCI agreed to clean the City's nearby sewer system, again, without ever having determined VCI was at fault. However, once VCI complied and paid to

16

clean the sewer, the City reneged on its agreement. An email, attached to VCI's complaint, between the City's manager and attorney shows the City never intended to reinstate the IPP Permit, regardless of any remedial measures VCI undertook.

This was not a legislative taking. Appellant specifically framed its complaint as an <u>exaction taking</u>. As the Supreme Court of the United States instructed just last year, in *Sheetz v. County. of El Dorado*, the correct framework for such issues under "*Nollan* and *Dolan* address this potential abuse of the permitting process."[56] There, the Court reiterated that "when the government withholds or conditions a…permit for reasons unrelated to its legitimate land-use interests, those actions amount to extortion."[57]

Thus, the correct framework for an exaction taking involving the potential abuse of the permitting process is set out in "a two-part test modeled on the unconstitutional conditions doctrine."[58] "First, permit conditions must have an 'essential nexus' to the government's land-use interest, ensuring that the government is acting to further its stated purpose, not leveraging its permitting monopoly to exact private property without paying for it."[59] "Second, permit conditions must have 'rough proportionality' to the development's impact on the land-use interest and may

---

[56] *Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 275 (2024)
[57] *Id*. at 268.
[58] *Id.*
[59] *Id.* (citing *Nollan v. Cal. Coastal Com.*, 483 U.S. 825 (1987).

not require a landowner to give up (or pay) more than is necessary to mitigate harms resulting from new development."[60]

Appellant has never disputed that the written conditions in the IPP Permit itself meet the first prong of *Nollan-Dolan* tests. Rather, VCI maintains – and has shown in its pleadings – that the City far exceeded its general police powers when it imposed new permit conditions that exceed any rough proportionality to mitigate harm from the continued use of the IPP Permit.

The City stripped VCI of its water discharge permit without any factual findings and then extracted substantial services for its infrastructure in exchange for the IPP Permit. Because the City never made any determination for the cause of the obstruction that VCI reported, it could never demonstrate its conditions bore even a rough proportionality to the mitigation of any harm from the IPP Permit's use. The City was then permanently foreclosed from making any such showing when VCI's cleaning operations determined the cause of the obstruction was the nearby bakery.

However, the trial court discarded the proper context of VCI's claim entirely and reframed the matter to fit its dismissal order. Instead of applying the exaction taking framework, the Northern District of Georgia dismissed these allegations on the sole basis that it believed VCI lacked a property interest in the IPP Permit.

---

[60] *Id.* (citing *Dolan v. City of Tigard*, 512 U.S. 374 (1994).

To reach this conclusion, the district court repeatedly points to a chameleon-like change in the nature of property rights. The order accused plaintiff of "conflating" a property interest under a Due Process analysis with a property interest under a Fifth Amendment, Takings Clause analysis. But instead, it was the district court that conflated a legislative taking in Montana with the exaction the City imposed upon VCI's IPP Permit.

In its order, the district court noted that property rights vest as a matter of state law. But, in order to justify its dismissal, the district court overlooked the law of the State of Georgia in favor of jurisprudence from the States of Florida, Pennsylvania, and most heavily, Montana. Clearly, the district court attempted to shoehorn its rationale into a predetermined decision, ignoring the true premise of the complaint.

However, Montana law does not apply to a Georgia permit here. And more importantly, the district court's rationale completely ignored the proper analysis of a claim for an exaction taking. Plaintiff's complaint did not allege a legislative taking or a Procedural Due Process Claim. Accordingly, the district court's entire premise of its order is deficient as it refused to consider the nature of the exaction claim presented in favor of a legislative taking.

Appellant respectfully asks this Court to reverse the district court's order dismissing its action and permit the parties to proceed to discovery and a final resolution on the merits.

19

<u>**ARGUMENT AND CITATIONS OF AUTHORITY**</u>

I.    THE DISTRICT COURT'S ANALYSIS MISCONSTRUED THE ACTION AS A LEGISLATIVE TAKING, NOT AN EXACTION WHICH VIOLATES THE FIFTH AMENDMENT.

"One of the principal purposes of the Takings Clause is to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."[61] The United States Supreme Court recognized, in *Sheetz v. County of El Dorado*, that in an exaction taking, "[p]ermit conditions are more complicated" than the sort of "intrusion on property rights [that constitute] a *per se* taking."[62]

As *Dolan v. City of Tigard* recognized, an exaction taking differs from the typical land use regulations in at least two ways. First, as is relevant here, land use regulations "involve[] essentially legislative determinations classifying entire areas of the city, whereas here the city made an adjudicative decision to condition petitioner's…permit on an individual parcel."[63] In this matter, the city council was not involved and there have been no changes to the City of Canton's Ordinances. Rather, two individual actors, City manager Billy Peppers and engineer David

---

[61] *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994).
[62] 601 U.S. 267 (2024).
[63] *Dolan* at 385.

Hatabian, took it upon themselves to lash out at VCI and impose specific conditions to reinstate the IPP Permit that was revoked without any explanation.

"Second, the conditions imposed [are] not simply a limitation on the use petitioner might make of [its IPP Permit], but a requirement that" VCI provide the benefit of cleaning the City's sewers.[64] This was a non-negotiable condition from the City in order to reinstate the Permit. Even then, once VCI submitted to this demand, the City then refused to fulfill its promise to reinstate the IPP Permit.

*Dolan* eloquently articulated the injustice here:

> "Under the well-settled doctrine of 'unconstitutional conditions,' the government may not require a person to give up a constitutional right -- here the right to receive just compensation when property is taken for a public use -- in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property."[65]

There was no proper basis to demand this ransom of cleaning services as the City never attempted to make a determination that VCI was even the cause of the sewer backup. Thus, as in *Dolan*, in the "absence of a nexus" to the new, discriminatory conditions for VCI's IPP Permit, the City was "in the position of simply trying to obtain" the benefit of free maintenance for its ailing infrastructure "through

---

[64] *Id.*

[65] *Dolan* at 385.

gimmickry, which converted a valid regulation of land use into 'an out-and-out plan of extortion.'"[66]

When the district court considered the City's motion to dismiss, it failed to apply the appropriate context of the exaction claim presented to it. The court should have viewed this action as the "unconstitutional conditions doctrine" of an exaction, rather than the legislative determinations from which the Supreme Court has unambiguously distinguished. Although the Court has discerned the <u>nature</u> of various takings vehicles, it has also held the Takings Clause equally "constrains the government without any distinction between legislation and other official acts."[67] "So far as the Constitution's text is concerned, permit conditions imposed by the legislature and other branches stand on equal footing."[68]

Instead of fixating on nonexistent Due Process and legislative claims, the district court should have applied the *Nollan-Dolan* test outlined again last year in *Sheetz v. County of El Dorado*:

"First, permit conditions must have an 'essential nexus' to the government's land-use interest. The nexus requirement ensures that the government is acting to

---

[66] *Id.* at 387.
[67] *Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 277 (2024).
[68] *Id.*

further its stated purpose, not leveraging its permitting monopoly to exact private property without paying for it."[69] That is exactly the basis for VCI's claim now.

The City was able to improve its infrastructure by forcing VCI to pay for it. The City did not relent on this condition. In fact, as alleged in the FAC, the City's engineer David Hatabian followed up with VCI to ask, "Has sewer been pumped, cleaned and camered [sic] yet?"[70]

The second part of this test is that "permit conditions must have 'rough proportionality' to the development's impact on the land-use interest."[71] "A permit condition that requires a landowner to give up more than is necessary to mitigate harms resulting from new development has the same potential for abuse as a condition that is unrelated to that purpose."[72] Importantly, this "test applies regardless of whether the condition requires the landowner to relinquish property or requires her to pay a 'monetary exactio[n]' instead of relinquishing the property."[73]

"No precise mathematical calculation is required, but the city must make some effort to quantify its findings in support of the dedication for the pedestrian/bicycle pathway beyond the conclusory statement that it could offset some of the traffic

---

[69] *Id.* at 275 (citations omitted).
[70] Doc. 9, ¶ 75.
[71] *Sheetz* at 275-76 (citations omitted).
[72] *Id.* at 276
[73] *Id.*

demand generated."[74] Not only did this cleaning cost thousands of dollars to VCI, it also cost VCI thousands more in expenses and lost business from its inability to discharge water into its drainage line.

*Nollan*, *Dolan*, and *Sheetz* inherently demonstrate this test applies to government-issued permits, just as the "unconstitutional conditions doctrine" applies to the IPP Permit at issue now. The true focal point in an exaction taking claim is not whether the permit is considered "property interest," but whether the government exacted money by leveraging that permit against the holder.

In *Sheetz*, the Court considered a residential building permit to build a prefabricated home that was conditioned upon a "substantial fee to mitigate local traffic congestion."[75] In *Nollan v. California Coastal Commission*, the California Coastal Commission conditioned "its grant of permission to rebuild [the Nollans'] house on their transfer to the public of an easement across their beachfront property."[76] The Commission staff "recommended that the permit be granted subject to the condition that they allow the public an easement to pass across a portion of their property."[77] And in *Dolan*, the city of Tigard conditioned the approval of a

---

[74] *Dolan* at 395-96.
[75] *Sheetz* at 270.
[76] *Nollan v. Cal. Coastal Com*, 483 U.S. 825, 827 (1987).
[77] *Id.* at 828.

building permit on the dedication of a portion of her property to assist with flood control and traffic improvements.[78]

As alleged, the City first revoked the IPP Permit in order to then impart uniquely discriminatory conditions for its reinstatement beyond what the City's ordinance requires for its own benefit. Its conditions cannot be connected to VCI as the City never established any such nexus by properly investigating the report that VCI made.

This conduct violates the Fifth Amendment as an exaction taking. Its intent to push VCI out of the Sunnyside neighborhood is evident by its stipulations to return the IPP Permit to active status and communications to "shut down" the business. As *Dolan* concluded, "'A strong public desire to improve the public condition [will not] warrant achieving the desire by a shorter cut than the constitutional way of paying for the change.'"[79]

Additionally, VCI has adequately pleaded an exaction taking because it was required to make affirmative improvements to the City infrastructure as a preconditioned ransom to reinstate that IPP Permit. However, the Takings Clause exists "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."

---

[78] *Dolan* at 377.
[79] *Dolan v. City of Tigard*, 512 U.S. 374, 396 (citing *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922)).

Therefore, Appellant respectfully asks that this Court reverse the district court's order and remand for further proceedings.

II.    UNDER GEORGIA LAW, PLAINTIFF'S VESTED RIGHT IN THE DISCHARGE PERMIT IS A CONSTITUTIONALLY PROTECTED PROPERTY RIGHT

The premise for the district court's analysis of a property right in the IPP Permit is inapplicable to an exaction claim. Still, VCI addresses the law in the State of Georgia to uphold that property rights in the IPP Permit are protectable.

A.    The Application of Montana State Law and Legislative Takings Do Not Apply

In addition to applying the incorrect framework to VCI's First Amended Complaint, the district court's order focused entirely on the misapplication of Georgia law to establish a property right in the IPP Permit. The district court acknowledged, "Property interests 'are not created by the Constitution. Rather, they are defined by existing rules or understandings that stem from an independent source such as state law.'"[80] Yet, the district court primarily looked to several states except for Georgia to reason whether the IPP Permit was a vested property right for the sake of a claim invoking the Takings Clause of the Fifth Amendment.

---

[80] Doc.18 at 6 (citing *Checker Cab Operators, Inc. v. Miami-Dade County*, 899 F.3d 908, 917 (11th Cir. 2018)).

26

The district court first acknowledged that a vested property right springs from state law, but then inexplicably attempted to invalidate VCI's property interest in the IPP Permit by primarily relying upon caselaw from the State of <u>Montana</u>. Clearly, the district court tried to shoehorn this rationale into a predetermined decision. However, the application of Montana law regarding a legislative taking does not fit the issues regarding discriminatory administrative decisions regarding a Georgia permit here.

In its twelve-page order, the district court cites *Kafka v. Montana Department of Fish, Wildlife, & Parks*, a 2008 decision from the Supreme Court of Montana. The court cites this opinion four times to describe the fluid characterization of a property right as dependent on whether a claim is a Due Process action or asserted under the Takings Clause of the Fifth Amendment.[81]

The pillar of the district court's decision is that it believed VCI "failed to 'appreciate the critical distinction between what might be considered property for purposes of due process, and what types of interests are considered compensable under the Fifth Amendment.'"[82] More specifically, the court mistakenly relied on *Kafka* to further reason its false premise that, "what is 'property' for purposes of the Takings Clause and what might be viewed as a 'property interest' under the Due

---

[81] Doc. 18 at 9, 10, and 11.

[82] Doc. 18 at 11 (citing *Kafka* at 20).

Process Clause" are dissimilar, and "reliance on due process cases to prove a particular property interest is compensable for purposes of a takings analysis is simply misplaced."[83]

*Kafka*'s 2008 opinion in no way provides any insight into what constitutes a vested property right in the State of Georgia. The petitioners in *Kafka* owned and operated alternative livestock game farms ("Game Farms") within the state of Montana."[84] To operate these game farms, they were required to obtain a statutory Game Farm license which included demanding requirement to avoid the threat posed by Chronic Wasting Disease.[85] But on November 7, 2000, Montana citizens voted to pass Initiative Measure No. 143 (I-143) which eliminated the ability to transfer a Game Farm license and extinguished a licensee's permission to "allow the shooting of game animals or alternative livestock."[86]

The Supreme Court of Montana acknowledged that I-143 eliminated the primary purpose of those licenses "because some individuals were willing to expend significant amounts of money to shoot alternative livestock within the confines of a Game Farm. By prohibiting fee-shooting, I-143 eliminated the most profitable use of the alternative livestock, and thus the profitability of Game Farms in Montana."[87]

---

[83] Doc. 18 at 9 (citing *Kafka* at 20).
[84] *Kafka v. Mont. Dep't of Fish, Wildlife & Parks*, 2008 MT 460, P2 (Mont. 2008).
[85] *Id.*
[86] *Id.* at P7.
[87] *Id.*

The Montana court thus rejected the notion that petitioners possessed a vested property right in the licenses for Game Farms for the purpose of a Takings Clause violation. It concluded that "the ability to operate a Game Farm was not a common law right, and that because this ability was wholly dependent upon legislative permission, the State was not required to pay compensation for any business loss resulting from I-143."[88] Montana's Supreme Court reasoned that the "t]he government is free to create programs that convey benefits in the form of property, but, unless the statute itself or surrounding circumstances indicate that such conveyances are intended to be irrevocable, the government does not forfeit its right to withdraw those benefits or qualify them as it chooses."[89]

In *Kafka*, the Montana Game Farmer licenses evaporated due to the legislative act, I-143. The IPP Permit in this case was not repealed for all Canton residents by any act of legislation. The City's ordinance remains exactly the same today as when the permit was revoked.

There was no unreasonable condition placed on Game Farmer licenses in *Kafka*. But here, the IPP Permit was stripped from VCI and held over its head with the express purpose of shutting it down without cause or just compensation. Simultaneously, the City hoped to exact from VCI the benefit of free work to its

---

[88] *Id.* at 35.
[89] *Id.* at 49.

infrastructure. When VCI made it undeniably clear its neighbor, La Luna Bakery, was the culprit of the sewer obstruction, the City ceased any further discussion about reinstating the permit or issuing a new one when the incumbent IPP Permit expired.

*Kafka* and its analysis on property rights are inapplicable to an exaction taking that scrutinizes the inequitable, discriminatory conditions placed on a permit.

B.  Under Georgia Law, Plaintiff has a Vested Right in the Permit

Even the district court recognized in its Order dated February 10, 2025, claims pursuant to the Takings Clause are evaluated under a two-part analysis.[90]  First, a court must determine whether a plaintiff has identified a constitutionally protected "property interest."[91]  Said property interest is a product of state law.[92]  Second, if a cognizable property interest exists, the court must analyze "whether the deprivation or reduction of that interest constitutes a 'taking.'"[93]  Accordingly, the threshold inquiry here, is whether under Georgia law, Plaintiff has a cognizable 'property interest' in the IPP Permit.

A vested right is a right which is "complete and consummated, and one of which the person to whom it belongs cannot be divested without his consent."[94]  To

---

[90] *See, e.g.*, *Givens v. Ala. Dep't of Corrs.*, 381 F.3d 1064, 1066 (11th Cir. 2004).
[91] *Id.*
[92] *Checker Cab Operators, Inc. v. Miami-Dade Cnty.*, 899 F.3d 908, 917 (11th Cir. 2018).
[93] *Givens*, 381 F.3d at 1066.
[94] *Hayes v. Howell*, 251 Ga. 580, 584 (1983).

have a property interest in a benefit, "a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."[95] That "legitimate claim of entitlement" is defined "by existing rules or understandings that stem from an independent source such as state law."[96] The Supreme Court of Georgia held in *Goldrush II v. City of Marietta*, that in the context of a license or permit, a landowner has a "legitimate claim of entitlement" when "a license can be suspended or revoked only upon proof of certain contingencies" which "engender[s] a clear expectation of continued enjoyment of [the] license absent proof of culpable conduct."[97]

Indeed, the Court in *Goldrush II* found that the City of Marietta code created that claim of entitlement because the liquor license could only be revoked on specific grounds.[98] The same is true here as the Canton ordinance, § 114-317(b) provides for thirteen exclusive bases for the suspension, revocation, or denial of a water discharge permit. Thus, the IPP Permit at issue here satisfies those prerequisites and bestowed upon Plaintiff a vested right and cognizable property interest in the IPP Permit and its reissuance.

---

[95] *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).
[96] *Bd. of Regents*, 408 U.S. at 577.
[97] *Goldrush II. v. City of Marietta*, 267 Ga. 683, 695 (1997) (holding that licensees had a vested right in a license that was subject to revocation or suspension only upon the occurrence of specified events).
[98] *Goldrush II* at 695.

The district court acknowledge this very authority and "recognize[d] that *some* type of property interest may exist in a permit or license if the permit or license 'can be suspended or revoked only upon a showing of cause.'"[99] The district court's order points out that *Goldrush II* is predicated on a Due Process claim. Nonetheless, the *Goldrush II* test is not limited only to Due Process claims.

The Supreme Court of Georgia has referenced the 'claim of entitlement' inquiry to determine whether a property interest was cognizable under Georgia's Takings Clause. Citing *Goldrush II*, the Georgia Supreme Court conceded "it may be true that an occupational or business license — once secured — can become a protected property right" in *Abramyan v. State of Ga*.[100] In the context of a takings claim, the Georgia Supreme Court reiterated that a property owner "must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."[101]

Mere allegations of any of the contingencies are not fatal to the IPP Permit but merely prompt a hearing on the matter. Only after a hearing, and a finding of fact that one of the above conditions is satisfied, is the City Manager vested with the right to suspend, revoke, or deny a wastewater discharge permit.[102] In order to renew a

---

[99] Doc.18 at 8 (citing *Goldrush II v. City of Marietta*, 482 S.E.2d 347, 359 (Ga. 1997)).
[100] 301 Ga. 308, 310 (2017).
[101] *Id.*
[102] CANTON CITY ORDINANCES, § 114-317(a).

wastewater discharge permit, the permittee must simply "apply for permit reissuance a minimum of 60 days prior to the expiration of the user's existing permit."[103]

Thus, as the IPP Permit cannot be revoked, except upon a showing of one of the thirteen enumerated conditions, and the City of Canton's Code of Ordinances lists no pre-conditions for the reissuance of the Permit for existing users, Plaintiff possesses a legitimate claim of entitlement and a vested right in the Permit and its reissuance upon expiration.

## C. The Court Misapplied of the Attributes of a Protected Property Interest

Despite its own contention that property rights are created as a matter of state law, the district court looked to several geographical locations to support its conclusion of law except for Georgia. Again, the basis for the court's analysis was incorrect when the focal point should be on the conditions placed on the IPP Permit to leverage the City's position with VCI.

First, the court reasoned that the IPP Permit is "not freely transferrable. Indeed, the Permit stated that it "may be transferred to a new owner or operator only if the permittee gives at least 60 days advance notice to the city manager *and* the city manager approves the wastewater discharge permit transfer."[104]

---

[103] *Id.*, § 114-315.
[104] Doc. 18 at 9-10 (citing City of Canton Municipal Ordinance Sec. 114-316(a)).

It is true that the IPP Permit in question was unique to Venture Commodities and serialized as number 008.[105] The permits in *Nollan*, *Dolan*, or *Sheetz* were similarly unique to their holders and properties.  This similarity only highlights that the district court viewed the complaint from the incorrect perspective, not as an exaction taking.

This fact also dispels the court's concern as to exclusivity. The court's order reasoned that, "While the Permit authorized Plaintiff to discharge its wastewater into the City's sewer, others were also allowed to discharge in the same area. In fact, Plaintiff shared 'the use of the local sewer system with several other nearby businesses including La Luna Bakery Panaderia.'"[106]

The IPP Permit was issued to VCI - and only VCI - for its discharge into the only line between its campus and the main conduit where La Luna Bakery's line also happens to intersect. As further evidence of its exclusivity, the IPP Permit must be sought through application on an individual basis under the Canton ordinances. And, per Section B of the Permit, VCI must submit compliance reports regularly.[107]

Next, the court cites *Bradshaw v. United States* for the proposition that the "permit like the one at issue here, 'is a right created by the government.' In the Court's view, the City 'cannot be required to compensate for value that it itself

---

[105] Doc. 9 at 1 and Exhibit A.
[106] Doc. 18 at 10.
[107] Doc. 9, Exhibit A.

created.'"[108] This is same misapplied logic from *Kafka*, as well. As discussed at length above, each of the permits in *Nollan*, *Dolan*, and *Sheetz* were similarly created by the government. The issue in those decisions, and at present, is not a legislative action which eliminated those permits, it is the government's independent conditions it unilaterally decided to impose and whether those conditions had a sufficient nexus to the government's land-use interest.

Lastly, the district court's reliance on *Marine One, Inc. v. Manatee County*, is also misplaced for several reasons. First, the case emanates from the State of Florida and applies its "public trust doctrine" not at issue here. There, this Court addressed "a permit to perform activities on public land" in the context of construction permits to build a dock on submerged public land.[109] This Court stated it was "doubtful that Florida courts would find a taking" where "state authorities exercise [their] proprietary powers to prevent a public harm, like hindrance to navigation."[110] Again, the issue here is not the police powers of the government. An exaction taking involves extortion for the continued use of the IPP Permit's benefits. Thus, the analysis must shift respectively.

The district court stated it "recognizes that the City's sewer is not 'public land' in the traditional sense. Plaintiff, however, does not own the sewer or have unbridled

---

[108] Doc. 9 at 10.
[109] *Marine One, Inc. v. Manatee County*, 898 F.2d 1490, 1491-92 (11th Cir. 1990).
[110] *Id.* at 1492.

access to it."[111] But, in its motion to dismiss the first complaint, the City attempted to distance itself from ownership of the segment of sewer in question:

> "There is no allegation in the complaint that the sewer at issue was constructed or maintained in the past by the City, or that the sewer line was within an easement granted to the City by Plaintiff or their predecessors in title. Accordingly, the City had no duty to repair or remedy the obstructed line it did not own, construct, or maintain. See *City of Gainesville v. Waldrip*, 345 Ga. App. 478, 480 (2018); *Mayor of Savannah v. Palmerio*, 242 Ga. 419, 426-27 (1978)."[112]

The City's ultimatums are even more egregious if it is learned in discovery that it did not even own this segment of sewer between VCI and La Luna.

Under the proper backdrop of an exaction taking, Venture Commodities has sufficiently alleged the City, through Peppers and Hatabian, extorted Appellant with the intent to squeeze it out of business and save the City money by forcing Appellant to service the City's infrastructure.

---

[111] Doc. 18 at 7, n.6.
[112] Doc. 8-1 at 15, n. 5.

## CONCLUSION

The district court was distracted by arguments concerning a "conventional" taking that usually occurs legislatively. An exaction taking, like the one pleaded here is far more conniving. Individual actors, like the City manager and engineer, abused their powers to obtain an unjust outcome such as "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." It is clear that the City of Canton, at the very least attempted to shortcut the "constitutional way of paying" for "improvements to the public condition."

An exaction has been properly described as "an out-and-out plan of extortion." That is precisely what VCI has pleaded here. Appellant has pleaded sufficient facts to show the city "leverage[d] its permitting monopoly to exact private property without paying for it." The focus then must be on the conditions imposed upon VCI, the nexus to government land interest, and the rough proportionality thereto.

The district court did not properly assess VCI's claims under these principles. Accordingly, Venture Commodities, Inc. asks this Court to reverse the district court and permit the parties to proceed to a final resolution on the merits of this matter.

## CERTIFICATE OF COMPLIANCE

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains no more than 13,000 words.

2. This document complies with the typeface requirements of Fed. R. App. P 32(a)(5) and the type-styled requirements of Fed. R. App. P. 32(a)(6) because this document been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365, version 2303 Build 16.0.16227.20202, in size 14 Times New Roman typeface.

This 20th day of June, 2025.

_____
Xavier T. Romero
State Bar No. 303588
FLINT, CONNOLLY & WALKER, LLP
131 East Main Street
Canton, Georgia 30114

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused the foregoing document to be served on all registered counsel of record by filing the same via the Court's ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure.

This 20th day of June, 2025.

Xavier T. Romero
State Bar No. 303588
FLINT, CONNOLLY & WALKER, LLP
131 East Main Street
Canton, Georgia 30114